**SIOUX TRIBE OF INDIANS et al. v. UNITED STATES.**

No. C–531(11).

Court of Claims.

Feb. 4, 1946.

See also 64 F.Supp. 312.

Ralph H. Case, of Washington, D.C. (J. S. Y. Ivins, of Washington, D. C., on the brief), for plaintiff.

George T. Stormont, of Washington, D. C., J. Edward Williams, Acting Asst. Atty. Gen., for defendant.

Before WHALEY, Chief Justice, and LITTLETON, JONES, WHITAKER, and MADDEN, Judges.

LITTLETON, Judge.

In this case the plaintiff by a separate amended petition, No. 11, to the original petition, which included all claims of plaintiff against defendant, sued to recover the price stipulated in an agreement of March 2, 1889, 25 Stat. 888, with interest at 5 percent per annum for certain land ceded to·

defendant out of the Great Sioux Reservation created and set apart for plaintiff by the treaty of April 29, 1868, 15 Stat. 635.

In the first hearing and decision under Rule 39(a) as to the legal right of plaintiff to recover on the claim made, the court held (97 Ct.Cl. 391) that the amount which became due plaintiff under the terms of the agreement of 1889, supra, was $5,307,655.-87, representing the price agreed to be paid plaintiff for 9,261,592.62 acres of land found by the court to have been ceded under such agreement. The agreement of 1889 was proposed to plaintiff by an act of Congress approved March 2, 1889, supra, which, after extended negotiations by commissioners appointed by the President with the various bands of plaintiff at a number of agencies on the reservation, was accepted and ratified by plaintiff under art. 12 of the treaty of 1868, supra, and became effective by proclamation February 10, 1890, 26 Stat. 1554.

In 1888 Congress, by an act, proposed a similar agreement which was rejected by plaintiff because the price offered therein for the land to be ceded was not satisfactory, and for certain other reasons. The agreement proposed by the act of March 2, 1889, and accepted by plaintiff embodied the demands made by plaintiff when it rejected the previous act. By the agreement of 1889 the Great Sioux Reservation was divided into six separately described reservations known as the Pine Ridge, Rosebud, Standing Rock, Cheyenne River, Crow Creek, and Lower Brulé Reservations, and provision was also made for a reservation in Nebraska for the Santee Sioux. In addition to the Indians of plaintiff tribe on these reservations, certain other bands of Indians were treated as a part of the Sioux Tribe and entitled to participate in and share the benefits of the agreement of 1889. These bands were the Ponca (of Nebraska) and the Flandreau. These two bands and the "Northern Cheyenne of Tongue River (Montana)", referred to in the account current in finding 9, are not made parties to the petition in this case.

After providing for the separate reservations and for the Ponca and Flandreau Indians, as above mentioned, the agreement ceded all the reservation land remaining and belonging to the Sioux Tribe, with certain exceptions not herein material, to the United States to become public lands. Section 21 provided that the ceded land would be opened for settlement and disposed of at $1.25 an acre for the first three years; seventy-five cents an acre for the next two years, and fifty cents an acre for the residue of the land then undisposed of, and that at the end of ten years from the effective date of the agreement (February 10, 1890) all undisposed of land would be paid for by the United States at fifty cents an acre. The agreement also provided that the total amount received and paid by the United States would be deposited to the credit of said Indians in a permanent fund.

The agreement authorized and directed certain expenditures for the benefit of the tribe for the purposes therein specified. Sec. 17 continued art. 7 of the treaty of 1868 for twenty years after February 10, 1890; provided for expenditures for livestock, farm implements and supplies, seeds for planting and cash payments to allottees, and made a permanent appropriation for these purposes to the end that these beneficial objects and payments, for the purpose of civilization and self-support, could be furnished and made when the agreement became effective and during the ten-year period allowed for disposal of and payment for the ceded land. This section and also sec. 22 provided for reimbursement of these expenditures out of the "permanent fund" of plaintiff. In addition to this permanent appropriation, an advance to plaintiff of $3,000,000 (reimbursable) was appropriated and made to the "permanent fund" at the time the agreement became effective. Sec. 17 provides in full as follows: "That it is hereby enacted that the seventh article of the said treaty of April twenty-ninth, eighteen hundred and sixty-eight, securing to said Indians the benefits of education, subject to such modifications as Congress shall deem most effective to secure to said Indians equivalent benefits of such education, shall continue in force for twenty years from and after the time this act shall take effect; and the Secretary of the Interior is hereby authorized and directed to purchase, from time to time, for the use of said Indians, such and so many American breeding cows of good quality, not exceeding twenty-five thousand in number, and bulls of like quality, not exceeding one thousand in number, as in his judgment can be under regulations furnished by him, cared for and preserved, with their increase, by said Indians: Provided, That each head of family or single person over the age of eighteen years,

who shall have or may hereafter take his or her allotment of land in severalty, shall be provided with two milch cows, one pair of oxen, with yoke and chain, or two mares and one set of harness in lieu of said oxen, yoke and chain, as the Secretary of the Interior may deem advisable, and they shall also receive one plow, one wagon, one harrow, one hoe, one axe, and one pitchfork, all suitable to the work they may have to do, and also fifty dollars in cash; to be expended under the direction of the Secretary of the Interior in aiding such Indians to erect a house and other buildings suitable for residence or the improvement of his allotment; no sales, barters, or bargains shall be made by any person other than said Indians with each other, of any of the personal property hereinbefore provided for, and any violation of this provision shall be deemed a misdemeanor and punished by fine not exceeding one hundred dollars, or imprisonment not exceeding one year or both in the discretion of the court; That for two years the necessary seeds shall be provided to plant five acres of ground into different crops, if so much can be used, and provided that in the purchase of such seed preference shall be given to Indians who may have raised the same for sale, and so much money as shall be necessary for this purpose is hereby appropriated out of any money in the Treasury not otherwise appropriated; and in addition thereto there shall be set apart, out of any money in the Treasury not otherwise appropriated, the sum of three millions of dollars, which said sum shall be deposited in the Treasury of the United States to the credit of the Sioux Nation of Indians as a permanent fund, the interest of which, at five per centum per annum, shall be appropriated, under the direction of the Secretary of the Interior, to the use of the Indians receiving rations and annuities upon the reservations created by this act, in proportion to the numbers that shall so receive rations and annuities at the time this act takes effect, as follows: One-half of said interest shall be so expended for the promotion of industrial and other suitable education among said Indians, and the other half thereof in such manner and for such purposes, including reasonable cash payments per capita as, in the judgment of said Secretary, shall, from time to time, most contribute to the advancement of said Indians in civilization and self-support; and the Santee Sioux, the Flandreau Sioux, and the Ponca Indians shall be included in the benefits of said permanent fund, as provided in sections seven and thirteen of this act: Provided, That after the Government has been reimbursed for the money expended for said Indians under the provisions of this act, the Secretary of the Interior may, in his discretion, expend, in addition to the interest of the permanent fund, not to exceed ten per centum per annum of the principal of said fund in the employment of farmers and in the purchase of agricultural implements, teams, seeds, including reasonable cash payments per capita, and other articles necessary to assist them in agricultural pursuits, and he shall report to Congress in detail each year his doings hereunder. And at the end of fifty years from the passage of this act, said fund shall be expended for the purpose of promoting education, civilization, and self-support among said Indians, or otherwise distributed among them as Congress shall from time to time thereafter determine."

Sec. 22 of the agreement provides as follows:

"That all money accruing from the disposal of lands in conformity with this act shall be paid into the Treasury of the United States and be applied solely as follows:

"First, to the reimbursement of the United States for all necessary actual expenditures contemplated and provided for under the provisions of this act, and the creation of the permanent fund hereinbefore provided; and after such reimbursement to the increase of said permanent fund for the purposes hereinbefore provided."

All allotments of land on the diminished reservations not ceded by the agreement of 1889, or sold and disposed of pursuant to subsequent acts of Congress relating to certain of the separate reservations (see Sioux Tribe v. The United States, 64 F.Supp. 312, decided this day), were made to the Indians of plaintiff tribe under sec. 8 of the agreement of 1889, which provides as follows: "That the President is hereby authorized and required, whenever in his opinion any reservation of such Indians, or any part thereof, is advantageous for agricultural or grazing purposes, and the progress in civilization of the Indians receiving rations on either or any of said reservations shall be such as to encourage the belief that an allotment in severalty to such Indians, or any of them, would be for the best interests of said In-

dians, to cause said reservation, or so much thereof as is necessary, to be surveyed, or re-surveyed, and to allot the lands in said reservation in severalty to the Indians located thereon as aforesaid, * * *."

The award of $5,307,655.87 by the court herein became due plaintiff February 10, 1900, on which date an accounting should have been had for the proceeds of the land ceded by the agreement as required by secs. 17 and 21 of the agreement; however no such account was then or thereafter set up by defendant, and at no time during the period March 2, 1889 to June 30, 1925 (the end of the period covered by the Report of the General Accounting Office herein), did defendant keep an account current as contemplated and called for by the agreement with respect to the principal and interest of plaintiff's fund, the sums and expenditures reimbursable therefrom on February 10, 1900 (adjusted to June 30, 1900), and the current annual expenditures thereafter properly and legally chargeable against the annual balances of such principal, miscellaneous receipts and accrued and annual interest on principal fund balances.

In this case neither party submitted to the court an account current contemplated by the terms and conditions of the agreement of 1889 showing the distributions or allocations of plaintiff's fund to the various bands entitled to participate therein under the agreement of 1889, the proper reimbursements from such fund and the annual charges thereto of expenditures for the benefit of the several bands. It therefore became necessary for the court to prepare such account as to principal and interest and miscellaneous receipts, and all advances, payments, and expenditures to June 30, 1925, made by defendant for benefit of plaintiff and properly reimbursable from such permanent fund and chargeable thereto. This detailed account current, with proper distributions of the fund and expenditures to the various bands, and schedules 3 to 3(e), inclusive, relating thereto, have been prepared by the court and are made a part of the findings by finding 9(c), and a correct summary of the correct account current is set out in finding 9(a).

The detailed facts and tabulations of advances, payments, expenditures, and distributions pertinent to and properly to be considered in connection with the accounting herein are set forth in the findings. All advances, payments, and expenditures which were from public funds were made under the treaty of 1868, supra, as amended, the agreement of September 26, 1876, ratified by the act of February 28, 1877, 19 Stat. 254, and under and as a result of the agreement of March 2, 1889, supra. As to all such disbursements which pertain to or enter into this accounting we have made findings and stated the account from the evidence as to the amounts and purposes of those disbursments by defendant which constituted obligations of the United States under the treaty of 1868 and the agreements of 1876 and 1889, and as to the amounts and purposes of the payments and expenditures by defendant which constituted obligations of plaintiff and reimbursable from and chargeable to the permanent fund of plaintiff which arose under the agreement of March 2, 1889.

On the evidence and under the findings we have excluded from the account prepared and set forth in finding 9 (as offsets against the $5,307,655.87 under sec. 2 of the jurisdictional act 41 Stat. 738) the educational expenditures of $1,769,511.73 made under and pursuant to the agreement of 1876 (finding 20) and $4,605,157.11 for day and industrial schools made under and pursuant to art. 7 of the treaty of 1868 and the first part of sec. 17 of the agreement of 1889 (finding 17). Likewise we have excluded as allowable offsets against the amount due plaintiff all sums appropriated and expended from public funds in the total amount of $34,504,374.50 for subsistence and civilization under and pursuant to the agreement of 1876 (findings 21, 22 and 23). These expenditures which totaled $40,879,043.34 to June 30, 1925, were appropriated and made for the benefit of plaintiff under the obligations assumed by defendant in the agreement of 1876 as consideration for the acquisition by defendant of the Black Hills land of plaintiff and under art. 7 of the treaty of 1868 and sec. 17 of the agreement of 1889. See Sioux Tribe v. United States, 97 Ct.Cl. 613, and Sioux Tribe v. United States, 64 F.Supp. 312, decided this day.

Inasmuch as none of the expenditures above mentioned is subject to be offset or charged against plaintiff or against the amount of $5,307,655.87 awarded herein by the court for the land ceded in 1889, there remains for consideration as reimbursements from and charges against the award in a correct account current under the agreement of 1889 the expenditures made by defendant from public funds for surveying and allotting of $634,466.99 (finding

14); for beneficial agricultural objects (livestock, farm implements, etc.) and cash awards of $8,427,329.54 (finding 15); interest fund expenditures for education, per capita payments, provisions, etc. (5% per annum withdrawals on interest warrants issued on the permanent fund advance of $3,000,000) of $4,247,011.26 (findings 12 and 13(c) and (d); expenditures from the $3,000,000 permanent fund advance (reimbursable) of $2,028,394.40 for pro rata shares paid by cash or credit to the members of the tribe and $30,000 revolving fund set up in 1922 for the plaintiff Indians on the Rosebud Reservation (findings 3 and 4); payment to the Flandreau Band of $42,-933.32 in lieu of allotments (finding 7), and the duplicate transfer to the "Cheyenne River Reservation 3% Fund" of $17,280 (finding 15(a). The total of these amounts is $15,398,415.51.

In its brief on the report of the commissioner and the record plaintiff states its claim of $13,382,023.62 for principal and interest (computed to Oct. 1, 1945) in connection with the award of $5,307,655.87, in what it considers to be a correct statement of the account for the ceded land under the agreement of 1889, as follows:

The defendant sets forth in its brief the items and the total amounts which it claims were reimbursable from and chargeable to plaintiff and its permanent fund of principal and interest under the agreement of 1889, as follows:

| | |
|---|---:|
| Reimbursement for permanent fund advance (finding 4) | $ 3,000,000.00 |
| Payment to Flandreau Sioux in lieu of allotments (finding 6) | 42,933.32 |
| Erroneous deposit to land sales account (finding 11) | 6,331.92 |
| Expenditures for surveying and allotting (finding 14) | 634,466.99 |
| Duplicate transfer to Cheyenne River Reservation 3% Fund (finding 15) | 17,280.00 |
| Expenditures for beneficial objects, articles and cash awards under sec. 17 (finding 15) | 8,427,329.54 |
| Appropriated and expended for education (finding 17) | 1,187,018.11 |
| Appropriated and expended for education (finding 20) | 1,769,511.73 |
| Total | 15,084,871.61 |

| | Principal | Time | Rate | Interest |
|---|---:|---|---:|---:|
| Interest on permanent fund advance | $3,000,000.00 | 10 yrs. | 5% | $ 1,500,000.00 |
| Interest on balance after reimbursement of advance | 5,264,722.55 | (2–10–1900 to 10–1–1945) | 228% | 11,993,567.41 |
| Total | 8,264,722.55 | | | |
| Charge against principal | 3,000,000.00 | | | 13,493,567.41 |
| | 5,264,722.55 | | | |
| Charge against principal, *pro rata* shares | 1,998,394.40 | | | |
| Bal. of principal | $3,266,328.15 | | | |
| Charges against interest: | | | | |
| Education (finding 13(c)) | | | | $4,196,909.75 |
| Surveying and allotting | | | | 635,522.31 |
| | | | | 4,832,432.06 |
| Less: | | | | |
| Disbursements for provisions | | | | 56,933.16 |
| Education (1895 to 1910) | | | | 1,394,000.00 |
| Seeds for planting | | | | 3,626.96 |
| | | | 1,454,560.12 | 3,377,871.94 |
| Bal. due, principal | 3,266,328.15 | | | |
| Bal. due, int. | | | | $10,115,695.47 |

Defendant does not claim as reimbursable items or as chargeable expenditures against plaintiff's funds the following disbursements under the agreement of 1889:

(a) The amount of $3,418,139 (finding 17) during the years 1891 to 1910, inclusive, for the cost of elementary branches of English education as provided for by art. 7 of the treaty of 1868 and revised by art. 5 of the agreement of September 26, 1876, to include "schools and instructions in mechanical arts" and continued in force for twenty years by sec. 17 of the agreement of 1889.

(b) The amount of $23,582.20 (finding 16) for the cost of erecting not less than thirty schoolhouses provided for in sec. 20 of the 1889 agreement.

(c) The amount of $99,161.19 (finding 18) for the cost of surveying, platting and selling the land ceded, as provided by sections 25 and 26 of the agreement.

(d) The amount of $27,560 (finding 18) for the payments made to Red Cloud and the Red Leaf Bands of Sioux.

(e) The amount of $24,740.47 (finding 18) for expenses of the Commission appointed to negotiate with plaintiff for ratification of the agreement of 1889.

Defendant insists that since it is obvious from the above-mentioned tabulations of reimbursements and charges that should be made against the proceeds from the sale of ceded land and interest thereon the permanent fund, consisting of $5,307,655.87 and interest on the $3,000,000 advance and on annual balances of the $5,307,655.87, was exhausted long prior to June 30, 1925, the petition should be dismissed.

Plaintiff concedes, in the above-mentioned tabulation of what it considers to be the correct statement of the account under the agreement of 1889, that as to reimbursable and chargeable items only the permanent fund advance of $3,000,000 and the payment of $42,933.32 to the Flandreau Indians should be charged against the permanent fund proceeds on February 10, 1900; that the pro rata cash shares of $1,998,394.40 paid from the $3,000,000 advance on the permanent fund should be charged against the permanent fund balance, and that there should be charged against interest on the permanent fund the expenditures of $635,522.31 for surveying and allotting, and the educational expenditures from the permanent fund interest, under sec. 17, of $4,196,909.75.

With the exception of the above-stated admissions, plaintiff insists that no portion of any of the other expenditures made by defendant under and for the purposes mentioned in the agreement of 1889 or under the agreement of September 26, 1876, is legally or equitably reimbursable from or chargeable against the permanent fund principal and interest. In support of this contention plaintiff argues that amounts appropriated and expended for the years 1911 to 1925, inclusive, for day and industrial schools under an extension of the first part of sec. 17 of the 1889 agreement and under art. 5 of the agreement of September 26, 1876, in the total amount of $2,956,529.84 (findings 17 and 20) were, as shown by the provisions of the appropriation acts, for obligations of the Government under the agreements of September 26, 1876 and March 2, 1889. Plaintiff further argues that no portion of the net expenditures from public funds by defendant for livestock, farm implements, supplies, seeds for planting and cash payments under sec. 17 of the 1889 agreement, in the total amount of $8,427,329.54 (finding 15(b) was reimbursable from or chargeable against plaintiff's permanent fund. As to the expenditures of $8,427,329.54 plaintiff contends that the provision of sec. 17 of the 1889 agreement as to these beneficial objects and payments was an extension and continuation of the obligation which the Government had assumed under the treaty of 1868, supra, which related to the furnishing by the Government of certain objects of a similar character to those members of the tribe who, pursuant to the provision of the treaty, took allotments or made selections of land on the reservation. Plaintiff therefore contends that the purposes for which such expenditures, in the total amount mentioned, were made under sec. 17 represented obligations assumed by the Government under the treaty of 1868 and the agreement of 1889.

 We agree with plaintiff that the expenditures for education for the fiscal years 1911 to 1925, inclusive, of $2,956,529.84 from appropriated funds, as set out in findings 17 and 20, under sec. 17 of the 1889 agreement and art. 5 of the agreement of 1876, are not chargeable against principal or interest of plaintiff's permanent fund. Defendant does not claim the educational expenditures under sec. 17 for day and industrial schools from 1890 to 1910. The provisions of the appropriation

acts under which these funds for day and industrial schools were provided show that the educational obligations assumed by the Government under sec. 17 were extended by Congress to and including the fiscal year 1916, and that for the period 1917 to 1925 inclusive, Congress specifically stated that the appropriations for day and industrial schools were being made under the educational obligations assumed by the Government under art. 5 of the agreement of 1876. See Sioux Tribe v. United States, C–531(18) to (24), supra. However, we cannot agree with plaintiff's contention as to the net expenditures of $8,427,329.54 under sec. 17 of the agreement of 1889 for livestock, farm implements, seeds, and cash payments to allottees under and pursuant to the supposed authority of the permanent appropriation in sec. 17, supra, which appropriation was intended to continue for a period of only ten years from February 10, 1890.

Sec. 21 of the 1889 agreement directed that at the end of the 10-year period after the effective date of the agreement allowed for disposal of the ceded land to settlers the Government should make a settlement with plaintiff by crediting to the permanent fund under sec. 17 the proceeds received from the land disposed of to settlers, and, in addition, 50 cents an acre from public funds for all land not so disposed of on February 10, 1900. Had this been done and if defendant had followed the provisions of secs. 17 and 22 as to reimbursements and the provisions of sec. 17, which contemplated and intended that subsequent expenditures for beneficial objects and awards and that interest fund and permanent fund expenditures should be charged currently to the permanent fund balances, the involved accounting in this case could not have arisen.

The evidence shows that during negotiations with the various bands of plaintiff tribe for their acceptance of the agreement of 1889 the commissioners appointed by the President pursuant to direction of Congress informed plaintiff in positive terms that only those expenditures for livestock, farm implements, and agricultural supplies, as provided by arts. 6, 8, and 10 of the treaty of 1868, for those Indians who made selections of land for farming under art. 6 of the treaty, would be furnished and paid for by the Government under the treaty (which articles the Commissioners insisted had already been furnished) and that all expenditures for livestock, farm implements, seeds and cash payments to be made under sec. 17 of the agreement to allottees under the agreement (who were to be given patents for allotments), and to those allottees whose allotments previously made under the treaty were confirmed by the 1889 agreement, would be charged against or "come out of" the proceeds from the ceded lands. This interpretation of the proposed agreement by the Commissioners was correct and it was accepted by the plaintiff Indians when they signed the agreement. Arts. 6, 8, and 10 of the treaty of 1868 provided, so far as here material, as follows:

"Article VI. If any individual belonging to said tribes of Indians, or legally incorporated with them, being the head of a family, shall desire to commence farming, he shall have the privilege to select, in the presence and with the assistance of the agent then in charge, a tract of land within said reservation, not exceeding three hundred and twenty acres in extent, which tract when so selected, certified, and recorded in the 'land book,' as herein directed, shall cease to be held in common, but the same may be occupied and held in the exclusive possession of the person selecting it, and of his family, so long as he or they may continue to cultivate it.

"Any person over eighteen years of age, not being the head of a family, may in like manner select and cause to be certified to him or her, for purposes of cultivation, a quantity of land not exceeding eighty acres in extent, and thereupon be entitled to the exclusive possession of the same as above directed. * * *"

"Article VIII. When the head of a family or lodge shall have selected lands and received his certificate as above directed, and the agent shall be satisfied that he intends in good faith to commence cultivating the soil for a living, he shall be entitled to receive seeds and agricultural implements for the first year, not exceeding in value one hundred dollars, and for each succeeding year he shall continue to farm, for a period of three years more, he shall be entitled to receive seeds and implements as aforesaid, not exceeding in value twenty-five dollars.

"And it is further stipulated that such persons as commence farming shall receive instruction from the farmer herein provided for, and whenever more than one hundred persons shall enter upon the cultiva-

tion of the soil, a second blacksmith shall be provided, with such iron, steel, and other material as may be needed."

"Article X. * * * And it is further stipulated that the United States will furnish and deliver to each lodge of Indians or family of persons legally incorporated with them, who shall remove to the reservation herein described and commence farming, one good American cow, and one good, well-broken pair of American oxen within sixty days after such lodge or family shall have so settled upon said reservation."

■ The oxen, agricultural implements, seeds, and instructions in farming provided in the 1868 treaty were furnished by the Government to those Indians entitled thereto who made selections of land and commenced farming, and there is nothing in the agreement of 1889 or in the evidence to show that the provision of sec. 17 as to the beneficial objects therein mentioned was intended to be an enlargement and extension of the limited obligation assumed by the Government under the quota provisions of arts. 6, 8, and 10 of the treaty. Plaintiff wanted the agreement to be interpreted as such an extension but this was not done. The allotments and the persons entitled to receive the objects, supplies, and payments under the 1889 agreement were different, and the amount and value of the livestock, farm implements, supplies and cash payments were greater under the agreement.

The evidence satisfactorily shows that plaintiff tribe understood the agreement of 1889 as interpreted to them by the Commission and that plaintiff Indians understood and agreed when they signed the agreement that the articles and payments to be furnished and made under sec. 17 would be paid for out of the proceeds from the ceded land. After the agreement had been accepted and signed by more than three-fourths of the adult male members of the tribe an authorized delegation from the tribe came to Washington with the Commissioners and reaffirmed the tribe's understanding as to this in the presence of the Commissioners and the Secretary of the Interior. This interpretation and understanding as to the intent and purpose of sec. 17 of the agreement is in accord with the language of secs. 17 and 22, and there is no proof that establishes that any authorized official of the Government has ever placed a different interpretation upon the agreement.

■ The proper treatment of the expenditures of $8,427,329.54 in the account (finding 9) prepared by the court in accordance with the evidence and the 1889 agreement shows that there is no amount due plaintiff with respect to principal or interest on the award of $5,307,655.87 heretofore made by the court in 97 Ct.Cl. 391. Instead of showing a balance due plaintiff the account shows that there is a net deficit against plaintiff in the amount of $4,911,-284.22 to June 30, 1925, which deficit is distributable and chargeable to the bands of the various reservations in the amounts as set out in finding 9(b). These deficits represent gratuitous expenditures from public funds for the benefit of the bands of plaintiff tribe as shown after the permanent fund and interest thereon had been exhausted by reimbursable and current expenditures.

The net collections of $357,908.44 from Sioux lands under the 1889 agreement, and now held in the Treasury in a suspense account entitled "Proceeds of Sioux Reservation, North and South Dakota, act of March 2, 1889" (finding 11), do not belong to plaintiff and should by proper accounting be transferred to federal funds.

■ Plaintiff finally says that the net expenditures of $8,427,329.54 for beneficial objects and cash payments under sec. 17 of the 1889 agreement were disbursements for individual Indians rather than for the benefit of the tribe and are therefore not chargeable against the tribal funds under the jurisdictional act. In view of the language and purpose of the agreement as it was intended and understood by the parties, this contention cannot be sustained. The agreement contemplated and the parties thereto understood and intended that these expenditures would be charged against the proceeds from the ceded lands and the claim herein is made under the agreement. This is sufficient to justify the charges made for these expenditures as being for tribal benefits under the terms of the agreement and within the meaning of the jurisdictional act.

■ In the detailed account current, with proper distributions to the various bands of plaintiff tribe, prepared in accordance with the agreement of 1889, so far as is possible on the accounting report at this time, plaintiff is credited as of February 10, 1890, with the $3,000,000 permanent fund advance, and interest at five per centum per annum of $150,000 a year is

computed thereon and credited to plaintiff in the total amount of $1,500,000. (The use of the term "plaintiff" includes all bands and groups of the tribe.) The defendant is reimbursed as of February 10, 1900, for the $3,000,000 permanent fund advance and $42,933.32 paid to the Flandreau Indians in lieu of allotments from the land proceeds of $5,307,655.87, and the remainder of '$2,-264,722.55 is credited to plaintiff's permanent fund, making the balance thereof $5,-264,722.55 on February 10, 1900. Additional interest of $102,369.60 is computed and credited to plaintiff's interest balance to June 30, 1900. The balances of principal and interest to June 30, 1900, amount to $6,867,092.15. To this amount is added miscellaneous receipts by and credited to plaintiff for the period 1878 to June 30, 1906 (averaged period for credit), in the total amount of $505,763.41. On June 30, 1900, therefore, the total amount to plaintiff's credit in the account current is $7,-372,855.56; and as of this date there is reimbursed to the United States the total of expenditures made for plaintiff's benefit between February 10, 1890, and June 30, 1900, in the sum of $2,577,149.48, which amount includes $261,396.74 for surveying and allotting, $1,111,669.78 for beneficial objects to allottees under sec. 17, and $1,204.082.96 of interest fund expenditures. The balance of $4,795,706.08 at June 30, 1900, represents $4,632,829.96 remaining in permanent funds and $162,876.12, unused balance of interest and miscellaneous receipts.

As of June 30, 1901, there is credited to plaintiff $231,641.50 representing interest at five per centum on the permanent fund balances for the fiscal year 1901. On the same date there is reimbursed to the United States and charged against plaintiff's funds the amount of $267,099.44, representing expenditures made for the fiscal year 1901 and including $61,853.66 current expenditures for surveying and allotting, $13,651.93 current expenditures for beneficial objects to allottees under sec. 17 and $191,593.80 current interest fund expenditures. There remains in the account current the sum of $4,760,248.14 on June 30, 1901, to plaintiff's credit which represents $4,597,241.92 of permanent fund balances and $163,006.22 of interest and miscellaneous receipts.

Interest is accrued in like manner from year to year on the diminishing balances of the permanent funds, and expenditures made by the United States are similarly deducted from year to year. The account current is carried along in this manner to include the fiscal year 1925. The expenditures are always applied in the account annually, first to the remainder and current interest and miscellaneous receipts, and then the excess against the permanent funds. Expenditures for certain of the tribes were much greater in proportion to the amounts of their funds and accordingly their funds became exhausted at earlier dates, as shown by the tabulation in finding 9(b).

Plaintiff is not entitled to recover and the petition is dismissed. It is so ordered.

JONES and WHITAKER, Judges, and WHALEY, Chief Justice, concur.

MADDEN, Judge, took no part in the decision of this case.